By the Court.*
McCue, J.
It is but just to the appellate court to remark that we have received but little aid from the counsel by whom the appeals were argued, on behalf of the defendants. Our attention was but briefly called to two points, in relation to which it was claimed that the court below erred, namely :
First. That the city court had no jurisdiction.
Second. That the deceased were in actual violation of the law regulating the observance of Sunday, on which day the accident occurred, and that their deaths. could not therefore be the subject of a cause of action.
All the questions in the case, involving the questions of negligence, the charge of the court, the admission or rejection of evidence, and the exceptions, were submitted to us under this point:
“It is submitted that the judgment in this action is erroneous, and that the same should be reversed.”
This constitutes the entire printed point handed up *349 in each case. When it is considered that these three cases contain nearly one thousand printed pages, it will be easy to see that it is quite possible to overlook many points of interest, and the propriety of the rule becomes very evident which requires that the attention of the appellate court should be reasonably directed to such features of the case, at least, as most plainly present the questions upon which the reversal of the judgment is asked.
It would seem from the printed point above cited, and from the oral statements of the learned counsel for the appellants, that the latter were disposed to rely entirely upon the supposed errors of the court below on the questions of jurisdiction, and violation of the Sunday law. I do not, therefore, feel called upon to examine at length the other questions raised, and the exceptions taken on the trial, as I should feel bound to do, had the points been raised and fully argued on the hearing.
It is claimed that the city court is a court of inferior local jurisdiction, within the meaning of article 6, section 14 of the Constitution ; that the acts of 1870 and 1871, extending the jurisdiction of the court, are unconstitutional ; and that, as the defendants were residents of New York, and were served with a summons in the city of New York, they are not properly in court.
Subdivision 5, section 14, article 6, of the Constitution, adopted November 3,1846, is as follows :
“Inferior local courts of civil and criminal jurisdiction may be established by the legislature in cities ; and such courts, except for the cities of New York and Buffalo,, shall have a uniform organization and jurisdiction in such cities.”
It was under this provision that the act was passed creating the city court (see Laws of 1849, ch. 125), and without further discussion we may admit that as thus created the city court was an inferior local court.
*350 Reference to the judiciary article of the Constitution, as amended in 1869, will demonstrate that the objection has no force when applied to the court as at present constituted. Section 12 of the amended judiciary article provides as follow :
“The superior court of the city of New York, the court of common pleas of the city and county of New York, the superior court of Buffalo, and the city court of Brooklyn, are continued with the powers and jurisdiction that they now severally have, and such further criminal and civil jurisdiction as may be conferred by law.”
The city court of Brooklyn was to be composed of such number of judges, not exceeding three, as might be provided by law, and vacancies in the office of the judges named, occurring otherwise than by expiration of term, to be filled in the same manner as vacancies in the supreme court. Section 12.
The city court of Brooklyn thus became recognized by the supreme law of the land as a constitutional court, and no longer subject to be abolished by the legislature, by which it had been created. Recognizing the usefulness of the court, and the necessity which might require an extension of its power, the Constitution expressly authorized the increase of the number of its judges, and the conferring upon it by law of further civil and criminal jurisdiction. The language employed is without qualification, and should be understood in its natural sense. It will be observed that the city court is named in the same sentence with the superior court of the city of New York, and the common pleas of the city and county of New York, and the jurisdiction of all regulated by precisely the same words. This section oleo authorizes the legislature to detail judges of the superior court and common pleas to hold terms of the supreme court in that city, as the public interests may require. Evidently, then, these last-named courts *351 and their judges were regarded as aids to the supreme court, and in certain cases equal thereto. It would be a great affront to the dignity of the supreme court to say that the Constitution had provided for the admission to its bench, from time to time, as the public interests might require, of additional judicial aid from among the judges of inferior local courts.
If a similar provision was not therein contained in reference to the judges of the city court of Brooklyn and of the superior court of Buffalo, it was probably because the framers of the Constitution regarded the judicial force already provided for in those cities as abundant. Reference is only made to this view of the case to show that it was clearly the intention of the Constitution, as it is now in force, to relieve these courts from whatever badge or mark of inferiority before attached to them, and to enable them to accept and exercise, without limit or restriction, such further civil and criminal jurisdiction as might thereafter be conferred by law, as fully as is exercised by the supreme court; and by “ law ” was meant the legislative power of the State vested in the Senate and Assembly.
Reference to another section of this same amended judiciary article should be sufficient, however, to set this question at rest. Section 19 reads as follows:
Inferior local courts of civil and criminal jurisdiction may be established by the legislature, and except as herein otherwise provided, all judicial officers shall be elected or appointed at such times and in such manner as the legislature may direct.”
Had the language been other inferior local courts, there might be some pretense for argument that the city court was still regarded as an inferior local court. The language employed, however, admits of no other construction than that the courts named in section 12 were not inferior local courts.
*352 The jurisdiction over the defendants was expressly given by the act of April 4, 1871, viz:
“To all other actions when the cause of action shall have arisen in, or when any of the parties to said action shall reside within the county of Kings, or when any of the defendants shall be personally served with the summons within said county” (Laws of 1871, § 1, ch. 282).
The plaintiffs were residents of the city of Brooklyn, and the summons in each case was served while the act above cited was in force.
The second cause of error alleged is that the deceased were engaged in the violation of the statute regulating the observance of Sunday. The defendants’ propositions may be briefly stated as follows :
The obligation between a common carrier and the person employing him, depends upon the contract between them. In these cases there were no valid contracts, and therefore all that the defendants could be held liable for was ordinary care and skill, and not for that extreme care and skill which would be required where a common carrier is engaged in the performance of a valid contract for hire.
We have been referred to a number of decisions of the courts of other States, which it is claimed sustain the doctrine contended for (1 Allen, 408; 14 Id., 485; 26 Penn., 342; 23 How. U. S., 218); and to one case in our own State (Nodine v. Doherty, 46 Barb., 59).
The Massachusetts cases, undoubtedly, hold the doctrine contended for, but the reasoning upon which the decisions rest does not commend itself to my judgment. “ They depend,” as was well said by Mr. Justice Grier in the case in 23 How. U. S., “on the peculiar legislation and customs of that State, more than upon any general principle of justice or law.”
The case of Mohrey v. Cook (26 Penn., 342), contains a very full review of the whole question. It holds *353 that the law relating to the observance of Sunday defines the duty of the citizen to the State and to the State only, and that the defendants could not shield themselves from liability on the ground that the plaintiff was engaged in the violation of the law regulating the observance of Sunday. Instead of sustaining defendants’ theory, the decision, as I understand it, takes precisely the opposite view.
The case of Nodine v. Doherty (46 Barb.), instead of' being an authority in support of defendants’ position, lays down a rule which is fatal to it when applied to the present case.
Doherty hired of Nodine a carriage and horses for the purpose of taking a ride to Coney Island, a pleasure resort. While in his possession the horses ran away, having been left untied, although he was cautioned that it was unsafe so to leave them. The carriage was damaged, and Nodine brought suit, in a justice’s court, to recover for the use of the horses, and also damages for injury, done to the carriage. The plaintiff was nonsuited, and, on appeal to the county court, the judgment was affirmed. An appeal was taken to the general term of the supreme court, in the. second judicial district, and the judgment below reversed.
Lott, J., in delivering the opinion of the court,, says:
“ The contract was illegal, . . . and the plaintiff was not entitled to recover any compensation for the use of' the property hired. The defendant, however, could not, after obtaining possession of the property, willfully injure it or suffer it to be injured through his negligence.. Such conduct has no necessary or legitimate connection with the contract of hiring ; the owner does not forfeit or become divested of- his right to the property by its; delivery under it; he has a right to the return of it,, and if it is refused after demand, an action could be- *354 maintained for the. recovery thereof, or its value, and there is no reason or principle why he should not as well be compensated for its deterioration, or any damage to it by reason of the fault of the party to whom it was hired. Such liability does not arise from the contract, but from a breach of duty in violation of the plaintiff’s rights, wholly irrespective of the contract.” '
The same doctrine was held in. the case of Harrison v. Marshall (4 E. D. Smith, 271). This was also the case of a horse hired upon Sunday and injured by the negligence of defendant. The general term of the common pleas, in reversing the judgment below, which was against the plaintiff, says : “The action is not for the proceeds of the hiring, but for damages for the wrong done.”
The role thus clearly and simply laid down may be applied with exactitude to the present case. Had an action been brought by any passenger on board of the Westfield to recover damages by reason of the-failure of defendants to convey him from New York to Staten Island, according to the contract made by the payment and acceptance of the ferriage, then the rule would have applied, that as the contract was illegal, and the breach of the contract was the foundation of the cause of action, there could be no recovery. But, as in the case of Nodine v. Doherty, it was held that the plaintiff had a right to the return of his property, and to recover damages for the injury done to it, either willfully or permitted by the negligence of the defendant, so in the present case we think the deceased had a right to 'skilled protection for life and limb while on the boat upon which they had been received as passengers, against the willful and negligent act of the defendants.
These are not the cases of travelers on a turnpike out of condition, by reason of which they meet with an accident upon a Sunday while upon an errand forbid *355 den by law, for in that case the travelers would be trespassers, having no right to enter upon the road. The deceased, however, were not trespassers upon the boat; on the contrary, they were there upon the express solicitation and permission of the defendants. The steamboat had not yet started on the fulfillment of that contract which it is claimed was illegal, but was lying in the slip. The defendants themselves were, on their own theory, in violation of the law, but the idea is the same. They invited and induced the deceased to come on their boat, they failed to perform their contract to convey them to Staten Island, and to this extent the statute gives them protection. But to hold that they had the right to imperil the lives of passengers by gross negligence, such as was found by the jury to have existed, is a proposition which strikes the mind at once as unreasonable. It would seem useless to look for authorities on this point; it is enough “ to consider the reason of the case, for nothing is law that is not reason ” (2 Ld. Raym., 911).
The defendants say the deceased were not killed by any act of theirs, but died while committing a violation of the law regulating the observance of Sunday. But there was no proof in the case that the deceased were traveling contrary to the provisions of the statute. It is penal in its nature, and should be strictly construed. The fact that a violation has been committed must be established affirmatively by him who claims the protection of the statute.
Landers and his wife were going to Staten Island for the benefit of a sick child, “ that he might have the air.” This was clearly a work of necessity, and duty on the part of the parents. Kelly and Madden, it is contended, were on a pleasure excursion, but it was also for the purpose of recreation and rest, and our courts have not yet decided that such rest is unnecessary to the overworked laborer. What is or is not a *356 work of necessity or charity should be determined by the circumstances of each case. The evident object of the statute was to prevent the day from being employed in servile work, which is exhausting to the body, or in merely idle pastime subversive of that order, thrift and economy of health and substance which is necessary to the preservation of society. It was never intended to prohibit such a use of the day as would be conducive to the health and necessary recreation of the citizen.
“ Acts not interfering with the benevolent design of the Sabbath, by disturbing and hindering those who for themselves and their families desire to enjoy and improve it, are not prohibited by the statute ” (Smith v. Wilcox, 24 N. Y., 353).
“When parties desire to bring a case within the statutory prohibition, they should produce satisfactory evidence that the facts are such as to make the statute applicable, and not to leave to mere inference what should be established by direct proof, where the intent is to take away a common law right” (Miller v. Roessler, 4 E. D. Smith, 234).
The proof on the part of defendants that any violation had been committed by the deceased, was, to make the most of it, only inferential.
Thus far I have examined the only points of error which were suggested, and those but briefly, on the argument.
It is difficult to say what other errors, if any, might have been urged as a cause for reversal. It is a common practice upon the argument of an appeal to rely entirely upon one or two salient points. One good reason for a reversal is sufficient. These cases are crowded from beginning to end with objections and exceptions, and, while I desire in all fairness, to examine all questions of real substance and not of mere form, that are presented, I am brought to the conclusion, after a careful reading of the testimony and charge of *357 the court, that no injustice has been done to the defendants, either by the court or jury. The weight of testimony was chiefly, to the effect that the engineer in charge was wanting in that skill and care which the law requires of one acting in his capacity, and that the defendants were equally negligent, in not providing such a boat and the requisite skill to manage the same, as their duty to the public wisely exacts. Whatever difference of opinion there may be on these points, the testimony was before the jury pro and con, and their verdict should be final.
.As to the questions of law presented by the charge-of the court, and the requests submitted by defendants’ counsel, the cases present some distinguishing features. In the Landers case the special defense set up was that the Westfield at the time of the accident was “navigating the navigable waters of the United States,” and that the damage and injury of which the plaintiff complains did not happen, through any neglect or failure to comply with the provisions of the acts of Congress for the better security of life on board of vessels, propelled in whole or in part by steam, nor through any known defect or imperfection of the steaming apparatus or hull of the said steamer West-field.
At the close of the plaintiffs’ case defendants’ counsel moved to dismiss the complaint. The motion was denied, and the defendants then gave in evidence among other acts the act of Congress approved February 28, 1871, also the certificate of enrollment of the Westfield, and the license of the Westfield.
The United States inspector, Mathews, who examined the boiler of the Westfield, and gave the certificate required by section 43 of the act of February 28, 1871, testified that he set the valve at twenty-seven pounds, and that the certificate allowed the steamboat to carry twenty-five pounds of steam.
*358 The engineer says that a short time before the explosion, but we cannot say how long before, there was on the boiler about twenty-six and a half pounds of steam, “it wasn’t quite twenty-seven.”
The theory of the defense is, that the right to recover damages conferred by section 43 of the act of Congress does not inure to the personal representatives of the deceased under, our statute, unless the injury complained of resulted from defendants’ negligence.
It was charged by the court, that if the explosion was caused by the steam being permitted to accumulate above twenty-five pounds per square inch, and the death of Landers was occasioned thereby, the defendants were guilty of negligence.
I think the charge correct. That the act in question, was passed to guard against certain well known perils in steam navigation, is manifested by its very title— “To provide for the better security of lives,” &c.
Steam as a motive power cannot be safely used, except by adjusting the amount of pressure with reference to the capacity of the boiler to resist that pressure. The ascertainment and adjustment of the relatively safe proportions of pressure and power of resistance, are provided for by an official inspection and certification in the case of every steam vessel before she can be licensed, registered and enrolled; and from time to time thereafter while she continues in. service. The amount of steam which the Westfield could safely carry had been ascertained and certified by such official inspection. It is evident that the boiler would grow weaker with use, not stronger. It ought prudently to carry even less steam than was permitted by the certificate, it could not safely be trusted to carry more ; and for that reason the act of Congress declared that any one sustaining damage through any failure to comply with the provisions of the act, should have *359 a right of action against the owners of the vessel and the master thereof.
The Westfield carried steam beyond the limit in the certificate. This point was conceded, and the jury found as a fact that the explosion and death were caused thereby. Did the court err in instructing the jury that carrying more than the limit prescribed by the certificate was negligence in contemplation of law ? We think not. The act of Congress warns all navigators against the danger of carrying an excess of steam; enjoins as a precaution against that danger not to carry steam beyond the limit in the inspector’s certificate, and declares the liability of owners who neglect or fail to observe that precaution..
When a statute warns against a specific danger and enjoins the observance of a specific precaution against the danger, the neglect or failure to observe that precaution, must be negligence per se (Johnson v. Bruner, 61 Penn., 58). It is this principle which underlies all governmental power and authority. It is the matured and well considered judgment of the law-making power of the State, and should not be open to question by any private individual or corporation.
In the other cases, this precise question is not presented. The act of Congress, though pleaded, was not formally introduced in evidence, and the cases went to the jury upon the general question of negligence without reference to the act.
I am not aware that in effect this makes any distinguishing feature or necessitates the application of a different rule. The act of Congress is a public act, of which the courts of this State are bound to take notice ; but if the rule were otherwise, we think the question of negligence was fairly submitted to the jury.
The only point made, was as to the degree of skill and care imposed upon the defendants. They insist that they were bound to exercise ordinary skill and *360 care only, while the court charged that they were bound to use the utmost care and diligence peculiar to cautious persons in respect to the boat,'boiler,.the use and control of the steamboat, and to do all that human skill and foresight, and the application of known scientific methods and appliances would have enabled them to do, for the protection of the passenger.
It would be an interminable labor to review in detail' the special requests to charge-made in these cases, as the discussion of each would practically involve a re-discussion of the entire law of the "case. In the Madden case the requests are twenty-seven in number, in the Kelly case, thirty-three, and in the Landers case, sixty-one. It would be strange, indeed, if amid such a mass of propositions involving mixed questions of law and fact, isolated expressions were not found to which ingenious counsel could take exception. The charge of the court, taken as a whole, was fair fin'd liberal to the defendants. In the Madden case the learned judge said to the jury—
“You will ask yourselves whether there was in that respect a faithful, skillful and reasonable performance of duty ; in other words, whether there was negligence.” And in the Kelly case, upon the special request of defendants’ counsel: “If the jury find from the evidence that the defendants, in furnishing their boat with the boiler in question, and in furnishing, equipping and operating their boat, exercised the utmost care and skill, the plaintiff cannot recover, and the defendants are entitled to their verdict.”
One other point perhaps worthy of attention is made in the Madden and Kelly cases, viz : that the defendants were not liable for any violation of the act of Congress so often before referred to. The court did, in effect, charge-as requested. The cases were submitted to the jury upon the liability of the defendants at common law, without reference to the act of Congress, *361 which, it was declared, was simply in aid of the common law. It is sufficient to say that this was presented in the light of the rule established in Caldwell v. New Jersey Steamboat Co. (47 N. Y., 282).
After a patient review of this branch of the case, we can discover no substantial error. The judgments appealed from, and the orders denying the motions for new trials, should be affirmed, with costs.
Thompson, J., concurred.
Judgments accordingly.

 Present, Thompson, Ch. J., and McCue, J.